UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| JAMARQUIS ETHERIDGE, | § |
| | § CASE NO. |
| Plaintiff | § |
| | § |
| v. | § |
| | § |
| AT&T, INC. AND AT&T MOBILITY, LLC | § |
| | § |
| Defendants. | § |
| | § JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff Jamarquis Etheridge ("Etheridge") is an individual and citizen of the State of Texas, by and through his counsel, Richard E. Brown of Richard E. Brown Attorney at Law, PC, complains and alleges based on his personal knowledge with respect to his own acts and on information and belief with respect to all other matters as follows:

### I. INTRODUCTION

1. Plaintiff Etheridge is a current wireless telephone customer of Defendants AT&T, Inc., and AT&T Mobility, LLC (collectively referred to as "AT&T" or "Defendant"). This is an action for damages and remedies for violations of, *inter alia*, the Federal communications Act, 47 U.S.C. § 201, arising in part from AT&T's failure to provide reasonable and appropriate security to maintain the security of and prevent unauthorized access to Plaintiff Etheridge's wireless account.

2. On or about September 10, 2020 AT&T improperly allowed wrongdoers access to Plaintiff Etheridge's wireless account and, without his authorization. AT&T was unable to contain this security breach until the next day, enabling wrongdoers to drain Plaintiff Etheridge's cryptocurrency exchange account.

1

3. As a result of this breach of security, Plaintiff Etheridge's exchange account was subjected to unauthorized transfers; he was deprived of his use of his cell phone number and required to expend time, energy, and expense to address and resolve this financial disruption and mitigate the consequences; and he also suffered consequent emotion distress.

## II.     JURISDICTION AND VENUE

4. This Court has jurisdiction over this matter under 28 U.S.C. §§ 1331 and 1367 on the grounds of federal question jurisdiction and supplemental jurisdiction over the state law claims because all the claims are derived from a common nucleus of operative facts and are such that Plaintiff would ordinarily be expected to try them in one action.

5. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) and (c).  A substantial part of the events or omissions giving rise to this Complaint occurred in this District.  AT&T is also headquartered and has its principal place of business in this District.  Wireless services subject of this Complaint were entered into in part in this District.  AT&T has received compensation as a result of its acts and practices in this District.

6. The Court has jurisdiction over the lawsuit under 28 U.S.C. §1332(a)(1) because Plaintiff and Defendants are citizens of different U.S. states, and the amount in controversy exceeds $75,000, excluding interest and costs.

7. Unless this Court permanently restrains and enjoins AT&T, AT&T will continue to engage in the acts and practices alleged in this Complaint.

8. Venue is proper in the Southern District of Texas.

## III.     PARTIES

9. Plaintiff Etheridge is an individual and a resident of Harris County, Texas.  Since in or about 2009 Plaintiff Etheridge has been an accountholder and subscriber with AT&T. Plaintiff Etheridge entered into the contract with AT&T in Harris County, Texas.

10. Defendant AT&T, Inc. is a Delaware corporation doing business in Texas and may be served with process by serving its Registered Agent, CT Corporation System at 1999 Bryan St., Ste. 900, Dallas, Texas 75201-3136 or wherever it may be found.

11. Defendant AT&T Mobility, LLC. is a Delaware limited liability company doing business in Texas and may be served with process by serving its Registered Agent, CT Corporation System at 1999 Bryan St., Ste. 900, Dallas, Texas 75201-3136 or wherever it may be found.

12. Plaintiff reserves the right to move the Court to convert and certify this action as a class action on behalf of the yet undefined class of individuals residing within Texas and/or elsewhere who were subjected to the same circumstances set forth here.

## PRELIMINARY STATEMENT

13. This action brought by Plaintiff Etheridge, an AT&T customer who lost hundreds of thousands of dollars in an incident of a rapidly-emerging identity theft crime: "SIM swapping" or "SIM hijacking".

14. A subscriber identity module, widely known as a "SIM card," stores user data in phones on the Global System for Mobile (GSM) network – the radio network used by AT&T to provide cellular telephone service to its subscribers.

15. SIM cards are principally used to authenticate cellphone subscriptions; as without a SIM card, GSM phones are not able to connect to AT&T's telecommunications network.

16. Not only is a SIM card vital to using a phone on the AT&T network, the SIM card also holds immeasurable value as a tool to identify the user of the phone – a power that can be corrupted to steal property and the identity of that user.

17. AT&T's Code of Business Conduct specifically promises that AT&T will "protect the privacy of our customers' communication" because "[n]ot only do our customers demand

3

this, but the law requires it. Maintaining the confidentiality of communication with AT&T's duties and obligations under the Federal Communications Act of 1934 and the pertinent implementing regulations.

18. Moreover, AT&T was well aware of the pervasive harm posed by SIM swapping, as AT&T has issued public advisories warning customers of the "industry-wide" threat and assuring those customers that AT&T was exercising adequate measures to prevent authorized SIM swapping from happening to its accountholders.

19. Notwithstanding AT&T's knowledge of the prevalence of SIM swapping and its assurance that it was actively protecting its customers, those measures did not adequately protect Plaintiff Etheridge from the harm he suffered.

20. As a result of AT&T's failures if not active participation in SIM swap theft that was inflicted upon him, Plaintiff Etheridge has had over 159.8 ETHEREUM Tokens of assets stolen from him.

21. Plaintiff Etheridge seeks compensatory and equitable relief restoring to him 159.8 ETHEREUM Tokens that were illegally taken from him as a result of AT&T's conduct and as alleged herein.

22. Since in or about 2009, Plaintiff Etheridge has been an accountholder and subscriber with AT&T.

## OTHER LIABLE PERSONS/ENTITIES

23. In addition to the entity set forth as Defendants herein, there are likely other parties who may well be liable to Plaintiff Etheridge, but respecting whom Plaintiff Etheridge currently lacks specific facts to permit him to name such person or persons as a party-respondent. By not

naming such persons or entities at this time, Plaintiff Etheridge is not waiving the right to amend this pleading to add such parties, should the facts warrant adding such parties.

## IV. FACTS

24. AT&T markets and sells wireless telephone service through standardized wireless service plans at various retail locations, online sales, and over the telephone. In connection with its wireless services, AT&T maintains wireless accounts enabling its customers to have access to information about the services they purchase from AT&T.

25. It is widely recognized that mishandling of customer wireless accounts can facilitate identify theft, related consumer harms, including the theft of third parties of consumers, including Plaintiff Etheridge.

26. Among other things, AT&T's sales and marking materials state "we have implemented various policies and measures to *ensure* that our interactions are with you or those you authorize to interact with us on your behalf – and not with others pretending to be you or claiming a right to access your information."[1]

27. AT&T's sales and marking materials further state that, unless AT&T can verify the caller's identity through certain personal information or a PIN if requested by customer, AT&T's policy is not to release any account specific information.

28. Despite these statements and other similar statements, AT&T failed to provide reasonable and appropriate security to prevent unauthorized access to customer accounts. Under AT&T's procedures, an unauthorized person, including AT&T's own agents and employees acting without the customer's permission, can be authenticated and then access and make changes to all the information the legitimate customer could access and make changes to if the customers were so authorized. As set forth in this Complaint, AT&T also fails to disclose or

---

[1] Emphasis added.

discloses misleadingly that its automated processes or human performances often fall short of its express and implied representations or promises.

29. In or about 2009, Plaintiff Etheridge entered into a service agreement with AT&T.

30. This agreement was for service on one (1) wireless telephones, for Plaintiff Etheridge.

31. On or about September 10, 2020, Plaintiff noticed his phone service was not working and immediately called AT&T to find out that his service was compromised.

32. Without obtaining Plaintiff's permission, his phone service had a four (4) digit passcode as well. While on the phone with the agent, Plaintiff was told to update a new passcode to his account and the agent would add "extra" security measures to Plaintiff's account.

33. Plaintiff's phone was restored hours later. The following day, Plaintiff's phone service was not working again and Plaintiff immediately called AT&T to see why this was happening and the agent said it was because the first agent only added Plaintiff's SIM back to the account and did not disable the fraudulent SIM. The actions of the first agent was how the fraudsters were able to deplete most of Plaintiff's cryptocurrency account.

34. The neglect of on behalf of AT&T's first agent/employee is clear, since Plaintiff's services have not been compromised since the second agent restored Plaintiff's services and completed the job properly.

35. Meanwhile, however, as a result of AT&T's failure to provide reasonable and appropriate security to prevent unauthorized access to Plaintiff Etheridge's wireless account, after getting control of Plaintiff Etheridge's phone number, wrongdoers were able to change Plaintiff Etheridge's password on one of his cryptocurrency accounts and remove most of the contents – 159.8 ETHEREUM Tokens ("Plaintiff Etheridge's 159.8 ETHEREUM Tokens").

36. After the incident, ETH price reached more than $4,200 per coin token.

db/20-12011/Complaint

37. By its procedures, practices and regulations, AT&T engages in practices that, taken together, fail to provide reasonable and appropriate security to prevent unauthorized access to its customer wireless accounts, allowing unauthorized persons to be authenticated and then granted access to sensitive customer wireless account data, including access and control over 159.8 ETHEREUM Tokens.

38. In particular, AT&T has failed to establish or implement reasonable policies, procedures, or regulations governing the creation and authentication of user credentials for authorized customers accessing AT&T accounts, creating unreasonable risk of unauthorized access. As such, at all times material hereto, AT&T has failed to ensure that only authorized persons have such access and the customer accounts are secure.

39. Among other things, AT&T:

a. failed to establish or enforce rules sufficient to ensure only authorized persons have access to AT&T customer accounts;

b. failed to establish appropriate rules, policies and procedures for the supervision and control of its officers, agents or employees;

c. failed to establish or enforce rules, or provide adequate supervision or training, sufficient to ensure that all its employees or agents follow the same policies and procedures. For example, it is often possible to persuade one of AT&T agents to not apply the stated security policy and allow unauthorized access without providing a PIN. similarly, on information and belief, AT&T agents or employees generally act on their own regardless of what is in the notes of a customer account, failing, among other things, to accommodate customers' security requests;

d. failed to adequately safeguard and protect its customers wireless accounts, including that of Plaintiff Etheridge, so wrongdoers were able to obtain access to his account;

e. permits the sharing of and access to user credentials among AT&T's agents or employees without a pending request from the customer, thus reducing likely detection of, and accountability for, unauthorized accesses;

f. failed to suspend user credentials after a certain number of unsuccessful access attempts. For example, wrongdoers would call numerous times trying to gain access to customer accounts before they finally got an agent on the line that would authorize access without requiring, for example, a PIN;

7

g. failed to adequately train and supervise its agents and employees in such a manner that allows its agents or employees, without authorization or approval to unilaterally access and make changes to customer accounts as if the customer were so authorized;

h. allows porting out of phone numbers without properly confirming that the request is coming from the legitimate customers;

i. lacked proper monitoring solutions and thus fails to monitor its systems for the presence of unauthorized access in a manner that would enable AT&T to detect the intrusion so that the breach of security and diversion of customer information was able to occur in Plaintiff Etheridge's situation and continue until after his virtual currency account was compromised;

j. failed to implement simple, low-cost, and readily-available defenses to identity thieves such as delaying transfers from accounts on which the password was recently changed or simply delaying transfers from accounts to allow for additional verifications from the customers; and

k. failed to build adequate internal tools to help protect its customers against hackers and account takeovers, including compromise through phone porting and wrongdoing by its own agents or employees actin on their own behalf or on behalf or at the request of a third party.

40. By the security practices and procedures described here, AT&T established user credential structures that created an unreasonable risk of unauthorized access to customer accounts, including that of Plaintiff Etheridge.

41. On information and belief, AT&T has long been aware about the security risks presents by, *inter alia*, its weak user credential structures or procedures. From prior attacks on customer accounts, AT&T has long had notice of those risks. In addition, AT&T did not use readily-available security measures to prevent or limit such attacks.

42. As a result of AT&T's faulty security practices, an attacker could easily gain access to a customer's account and then use it to gain access to the customer's sensitive information such as bank accounts or virtual currency accounts, among other things.

43. As such, AT&T's security measures were entirely inadequate to protect its customers, including Plaintiff Etheridge.

44. Lack of adequate security in AT&T's systems, practices, or procedures enabled the wrongdoers to access Plaintiff Etheridge's wireless account, which then enabled the wrongdoers to access and steal his virtual currency account and possibly other sensitive information.

45. As such, AT&T failed the responsibility it owed to Plaintiff Etheridge to protect his account and his phone number. Even if the subject incident was due to an "inside" job or human performance falling short, AT&T is responsible for its agent. And, while AT&T can outsource customer service functions, AT&T cannot transfer accountability.

46. Had AT&T provided adequate account security or exercised reasonable oversight, Plaintiff Etheridge would not have lost his phone number and Plaintiff Etheridge's 159.8 ETHEREUM Tokens or otherwise been damaged.

47. Making matters worse, Plaintiff Etheridge is not the only AT&T customer to suffer as a result of AT&T's failure to ensure adequate security of its customer accounts.

48. After the incident, Plaintiff Etheridge sent a letter to AT&T explaining the predicament and trying to resolve this matter. AT&T responded with a low settlement offer.

49. Plaintiff Etheridge believed that AT&T's actions were illegal. As such, he sought assistance of counsel.

50. As a direct consequence of AT&T's actions or inactions, Plaintiff Etheridge has suffered and continues to suffer actual damages, including: (a) lost time; (b) embarrassment and humiliation; (c) aggravation and frustration; (d) fear; (e) anxiety; (f) financial uncertainty; (g) unease; (h) emotional distress; (i) expenses, including missed work, delayed projects, postage expenses and attorney's fees and costs; and (j) lost value of Plaintiff Etheridge's 159.8 ETHEREUM Tokens.

db/20-12011/Complaint

## V.  FEDERAL COMMUNICATIONS ACT

51. Plaintiff re-alleges the foregoing allegations and incorporates these allegations by reference as if fully set forth herein.

52. The FCA regulates interstate telecommunications carriers such as Defendant.

53. Defendant is a common carrier engaged in interstate communication by wire for the purpose of furnishing communication services within the meaning of section 201(a) of the FCA.  As "common carrier," Defendant is subject to the substantive requirements of sections 201 and 202 of the FCA.

54. Under section 201(b), common carriers may impose only those practices, classifications, and regulations that are "just and reasonable."  and, under section 202(a) common carriers are prohibited from making any unjust or unreasonable discrimination in "practices, classifications, regulations, facilities, or services."

55. Should a common carrier "omit to do any act, matter, or thing in this chapter required to be done," section 206 dictates that the "common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violations … together with a reasonable counsel or attorney's fee[.]"

56. Defendant's conduct, as alleged here, constitutes a knowing violation of section 201(b) and section 202(a).  Further, under section 217, Defendant is also liable for the acts, omissions, or failures, as alleged in this Complaint, of any of its offers, agents, or other persons acting for or employed by Defendant.

57. Additionally, Defendant is a "telecommunications carrier" within the meaning of section 222, which requires every telecommunication carrier to protect, among other things, the confidentiality of propriety information of, and relating to, customers.

58. Defendant's conduct, as alleged here, constitutes a knowing violation of section 222. On information and belief, Defendant disclosed, without Plaintiff's approval, Plaintiff's proprietary information to a third party or parties for reasons other than for emergency services. Defendant also improperly permitted access to Plaintiff's customer proprietary network information in Defendant's provisions of its services.

59. As a direct consequence of Defendant's violations of the FCA, Plaintiff has been damaged and continues to be damaged in an amount to be provide at trial.

## VI. BREACH OF CONTRACT

60. Plaintiff re-alleges the foregoing allegations and incorporates these allegations by reference as if fully set forth herein.

61. Plaintiff entered into a contract both express and implied with Defendant.

62. Defendant offered to provide wireless phone service in consideration of payment for services from Plaintiff. Under the terms of the agreement, Plaintiff was required to pay in full the agree-to charges submitted to him on his bills. Failure to pay in full would cause a breach of contract and discontinuance of wireless telephone service, among other things. Plaintiff accepted the offer of services from Defendant and performed all the conditions, covenants, promises, and agreements required of him under the terms of the contract, and all conditions precedent have otherwise occurred or been waived.

63. Among other things, the express and implied terms of the contract were that Defendant would provide reasonable and appropriate security to prevent unauthorized access to his wireless account or otherwise safeguard and protect Plaintiff's private and confidential account information and not transfer his phone number to anyone without his express authorization.

64. Defendant has failed, neglected, and refused, and continues to fail, neglect, and refuse to perform its part of the contract or to tender such performance.

65. In the absence of such implied and express contract terms, Plaintiff would have acted differently in his purchasing decision or would not have agreed to entered into a contract with AT&T. Nor would he have entered into the contract if AT&T had properly disclosed to him the true extent of its account security measures or lack thereof.

66. As a direct consequence of Defendant's breach of the contract, Plaintiff has been damaged and continues to be damaged in an amount to be proven at trial.

## VII.  NEGLIGENCE

67. Plaintiff re-alleges the foregoing allegations and incorporates these allegations by references as if fully set forth herein.

68. Defendant owed Plaintiff a duty of, *inter alia*, care in the handling and safeguarding of his customer account for the purposes of providing wireless services.

69. Defendant breached the duties it owed to Plaintiff.

70. As a direct consequence of Defendant's negligence, Plaintiff has been damaged and continues to be damaged in an amount to be proven a trial, no part of which has been paid.

## VIII.  VIOLATION OF TEXAS DECEPTIVE TRADE PRACTICES ACT

70. Plaintiff re-alleges the foregoing allegations and incorporates these allegations by reference as if fully set forth herein.

71. Plaintiff is a consumer as that term is defined under the Texas Deceptive Trade Practices Act ("DTPA"). One or more of the Defendants engaged in deceptive acts or practices in soliciting Plaintiff to use the AT&T cellular phone service. In particular, the false, misleading and deceptive acts perpetrated by one or more of the Defendants included, but not limited to:

db/20-12011/Complaint

a. causing confusion or misunderstanding about the source, sponsorship, approval or certification of goods and services;

b. causing confusion or misunderstanding about affiliation, connection, or association with, or certification by another;

c. representing that goods or services have sponsorship, approval, characteristics, or benefits that they do not have;

d. advertising goods or services with the intent not to sell them as advertised;

e. representing that an agreement confers or involves rights, remedies or obligations that it does not, or that are prohibited by law;

f. misrepresenting the authority of the salesman, representative or agent to negotiate the final terms of a consumer transaction; and

g. failing to disclose information about goods or services that was known at the time of the transaction and the failure to disclose was intended to induce the consumer to enter into the transaction that consumer would not have entered into if the information had been disclosed.

72. Plaintiff relied on the false, misleading or deceptive acts and practices engaged in by one or more of the Defendants.  As a result, Plaintiff suffered damages caused by the false, misleading or deceptive acts or practices by one or more of the Defendants.

73. Plaintiff has suffered economic damages as a result of the Defendants' actions in an amount to be determined at trial.  In addition, because Defendants' actions were knowing and intentional violations of the DTPA, Plaintiff is entitled to treble damages under the statute.  In addition, Plaintiff is entitled to his reasonable and necessary attorneys' fees incurred in the prosecution of this action.  Tex. Bus. Com. Code §17.50(d).

IX. **NEGLIGENT HIRING, RETENTION, AND SUPERVISION**

74. Plaintiff re-alleges the foregoing allegations and incorporates these allegations by reference as if fully set forth herein.

75. At all times material hereto, Defendant's agents, officers, and employees, including those directly or indirectly responsible for or involved in transferring Plaintiff's phone number to another carrier were under Defendant's direct, supervision, and control.

76. Defendant further assumed this duty by holding its officers, agents, and employees out to the public as competent representatives.

77. On information and belief, Defendant negligently retained, controlled, trained, and supervised its agents and employees when Defendant knew or should have known they posted a security threat.  Defendant knew or should have known that is agents or employees would allow unauthorized access its customer accounts, including that of Plaintiff.

78. On information and belief, Defendant negligently retained, controlled, trained, and supervised its agents and employees so they committed the wrongful acts complained of herein against Plaintiff and other members of the public.  On information and belief, Defendant failed to properly control and supervise them to ensure customer account safety.

79. It was foreseeable to Defendant is agents and employees would compromise customer account safety or engage in other acts complained of here.  Despite this knowledge, Defendant failed to exercise reasonable care to supervise or control its agents and employees. On information and belief, Defendant engaged in the acts alleged herein and/or condoned, permitted, authorized, and/or ratified the conduct of its agents and employees

80. As a direct result of Defendant's negligent hiring, control, retention and supervision, Plaintiff has suffered damages in an amount to be proven at trial.

## X. NEGLIGENT INFLICTION OF EMOTION DISTRESS

81. Plaintiff re-alleges the foregoing allegations and incorporates these allegations by reference as if fully set forth herein.

82. Defendant could foresee that is actions would harm Plaintiff.

83. Defendant had a duty to Plaintiff.

84. Defendant breached its duty to Plaintiff.

85. Defendant made false and material misrepresentations regarding its security measures and failed to establish and implement reasonable policies and procedures governing the creation and authentication of user credentials for persons accessing Defendant's databases and customer information.

86. Defendant's actions have resulted in severe emotion distress and/or garden variety emotional distress for Plaintiff, and Defendant's reckless disregard for Plaintiff's customer account has significantly deteriorated Plaintiff's health.

## XI.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

1. Judgment against Defendant for actual damages;

2. Statutory damages for DTPA and Federal Communications Act violations;

3. Treble damages under DTPA, calculated from the damages determined by the Court;

4. Award of reasonable attorney fees and reimbursement of all costs for the prosecution of this action under DTPA and other statutory provisions;

5. Pre – and post-judgment interest on any amounts awarded;

6. Punitive damages as applicable; and

7. Such other and further relief as the Court deems just and proper.

## TRIAL BY JURY

Under the seventh amended to the Constitution of the United States of America, Plaintiff is entitled to, and demands, a trial by jury.

DATED this 8th day of September 2021.

          Respectfully submitted,

          RICHARD E. BROWN ATTORNEY AT LAW, P.C.

          */s/ Richard E. Brown*
          RICHARD E. BROWN
          54 Sugar Creek Center Blvd., Suite 300
          Sugar Land, Texas 77478
          Tel:   (713) 977-8178
          Fax:   (281) 888-1723
          E-mail: brownreb34@aol.com
          State Bar of Texas No. 03162400

          **ATTORNEY FOR PLAINTIFF**
          **JAMARQUIS ETHERIDGE**